**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                  :

SOTHEBY'S, INC.,                         :

                                            :      16 Civ. _____

                          Plaintiff,      :

                                            :

      -against-                  :

                                            :

R.W. CHANDLER, LLC, ROBERT SIMON FINE  :
ART, INC., SIX HAMILTON, LLC, SALVATOR  :
MUNDI, LLC, RITTENHOUSE ASSOCIATES  :
LLC, ADELSON GALLERIES, INC., WARREN  :
ADELSON, ALEXANDER PARISH, ROBERT  :
SIMON,                                    :

                                          :

                          Defendants.   :
-----------------------------------------------------------------x

<u>**COMPLAINT**</u>

      Plaintiff Sotheby's, Inc. ("Sotheby's"), by and through its undersigned counsel, hereby alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

      1.      This is an action for a declaratory judgment, pursuant to 28 U.S.C. § 2201, seeking a declaration that Sotheby's has complied with all of its obligations arising under certain contractual agreements with Defendants R.W. Chandler, LLC ("R.W. Chandler"), Robert Simon Fine Art, Inc. ("Robert Simon Fine Art"), Six Hamilton, LLC ("Six Hamilton"), Salvator Mundi, LLC ("Salvator Mundi"), Rittenhouse Associates LLC ("Rittenhouse Associates"), Adelson Galleries, Inc. ("Adelson Galleries"), Warren Adelson ("Adelson"), Alexander Parish ("Parish"), and Robert Simon ("Simon") (collectively, "Defendants") pertaining to the sale of Leonardo Da Vinci's painting of *Christ as Salvator Mundi* (the "*Salvator Mundi*"); that the Defendants have suffered no loss in connection with those contractual agreements or the *Salvator Mundi* sale; and that, to the extent the Defendants have suffered any loss in connection with the sale of the

*Salvator Mundi*, Sotheby's did not cause that loss and is not otherwise liable to the Defendants for such loss under any legal theory.

2.      As set forth below, this action arises out of a dispute between a collector, Dmitry Rybolovlev, and his former advisor or agent, Yves Bouvier, a Swiss businessman and art collector.  In 2013, the Defendants, experienced and prominent art collectors and dealers, sold the *Salvator Mundi* for money and art valued at $80 million to an entity controlled by Bouvier.[1] The $80 million sale price was likely a world record price for an Old Master painting, resulting in a tremendous profit for the Defendants, one of whom (Parish) reportedly had purchased the painting at an estate sale for less than $10,000.

3.      Despite enjoying a tremendous windfall when they sold the *Salvator Mundi* to Bouvier, and despite the fact that Adelson personally negotiated the sale with a representative of Bouvier (referred to herein as "Bouvier's Agent"), the Defendants nevertheless assert that they should have received tens of millions of dollars more.  Specifically, upon learning that Bouvier re-sold the *Salvator Mundi* for a higher price, the Defendants now assert that they are entitled to the price that Rybolovlev paid for the painting—even though Rybolovlev has accused Bouvier of achieving that higher price through fraud.  Indeed, Bouvier later was arrested in a Monaco criminal proceeding in connection with that alleged fraud.  According to Rybolovlev's allegations, while the Defendants were locked in negotiations with Bouvier about selling the Leonardo for a price of around $80 million, Bouvier was simultaneously representing (falsely) to

---

[1] Bouvier paid a total of $83 million in connection with the purchase of the *Salvator Mundi*, which included a $3 million commission to Sotheby's for facilitating the sale.  The commission was disclosed to the Defendants in the May 1, 2013 sale agreement discussed in ¶¶ 43-46 below. The agreement also expressly provided that in no event would the Defendants owe a commission to Sotheby's, and that any commission paid would be in addition to the sale price and would not reduce the amount received by the Defendants.  The price received by the Defendants for the *Salvator Mundi* is thus referred to herein as $80 million.

Rybolovlev that the Defendants had summarily rejected an offer of $100 million and that the deal was thereafter clinched at $127.5 million.  The Defendants are now seeking to get the benefit of that allegedly fraudulently induced sale price.

4.      According to media reports and court filings, after purchasing the *Salvator Mundi*, Bouvier immediately re-sold the painting for $127.5 million to Rybolovlev.  At no time did Bouvier or Bouvier's Agent (or anyone else representing Bouvier) disclose to Sotheby's that Bouvier had the intent to re-sell the *Salvator Mundi* immediately after purchasing it, much less that Bouvier intended to sell the painting for tens of millions of dollars more than the price Bouvier paid to the Defendants for it.

5.      Sotheby's was not involved with Bouvier's re-sale of the *Salvator Mundi* to Rybolovlev and it derived no financial benefit whatsoever from the sale.  Rybolovlev has filed civil suits and leveled criminal charges against Bouvier and associated individuals and entities in a number of jurisdictions throughout the world, including in Monaco, France, and Singapore. Rybolovlev has alleged in these various cases that Bouvier cheated him out of over $1 billion in connection with the sales of approximately 38 important pieces of art, one of which is the *Salvator Mundi* at issue in this action.  Sotheby's only learned of the re-sale of the painting to Rybolovlev after Bouvier's arrest in Monaco, almost two years following the Defendants' sale of the painting to Bouvier.

6.      The sale price that Bouvier paid for the *Salvator Mundi* was the product of a long and hard-fought negotiation between Defendant Adelson—a prominent and respected art historian, dealer, and collector—and Bouvier's Agent.  Sotheby's had connected the parties to the sale at Bouvier's request and facilitated the negotiation between them, and in doing so entered into two limited purpose and limited duration written agreements with the Defendants,

-3-

complying fully with its obligations under those agreements.  While Sotheby's facilitated the deal for the *Salvator Mundi*, Defendant Adelson and Bouvier's Agent negotiated the sale price during a vigorous face-to-face negotiation.  Rybolovlev has maintained that the true, fair price for the painting was the amount that resulted from those arms-length negotiations between the Defendants and Bouvier's Agent—$80 million—and that Bouvier therefore cheated him out of at least $47.5 million, the difference between the amount Rybolovlev reportedly paid ($127.5 million) and $80 million.

7.      On February 8, 2016, *The New Yorker* published a lengthy article about the dispute between Rybolovlev and the allegations he has made concerning his art purchases. Almost immediately after *The New Yorker* article was published, the Defendants contacted Sotheby's and asserted that Sotheby's owes them damages arising out of the sale of the *Salvator Mundi*.  While the Defendants' legal theories have been difficult to discern, they have asserted that Sotheby's should pay them, at a minimum, the difference in price between the $80 million they were paid and the $127.5 million that Rybolovlev paid Bouvier.  They also have asserted that they intend to bring a civil action asserting, among other causes of action, claims alleging breach of fiduciary duty, fraud, and a violation of the civil RICO statute, 18 U.S.C. § 1964(c).

8.      The Defendants' claims are entirely without merit.  These Defendants are experienced art professionals, experts in their fields, who voluntarily sold the Leonardo for a huge profit at a price they agreed to after direct, arms-length negotiations.  Once Bouvier purchased the Leonardo, it was Bouvier's to hold or sell as Bouvier saw fit.  While Sotheby's has since learned, through press reports and court documents, that Bouvier sometimes re-sold to Rybolovlev works of art that Bouvier had purchased through Sotheby's, Bouvier also purchased a number of works of art through Sotheby's that he appears not to have re-sold.  But now the

Defendants, apparently experiencing seller's remorse, are trying to gain the benefit of a subsequent sale price that Sotheby's had nothing to do with and that allegedly was fraudulently induced.  While the Defendants no doubt wish they had made even more money from their sale of the *Salvator Mundi*, the fact that Bouvier re-sold the painting to Rybolovlev for a significant profit—whether legitimately or through fraud—provides no justification for trying to reap any benefit from Bouvier's sale, and certainly creates no valid cause of action against Sotheby's. Accordingly, Sotheby's seeks entry of judgment declaring that it is not liable to the Defendants for any purported loss suffered with respect to the *Salvator Mundi* sale.

## PARTIES

9.      Sotheby's, Inc. is a New York corporation with its principal place of business at 1334 York Avenue, New York, NY 10021.  Sotheby's is engaged in the business of brokering and facilitating sales of, among other things, fine and decorative art, jewelry, real estate, and collectibles.  The company provides, *inter alia*, auction services, corporate art services, and private sales services.

10.      Defendant R.W. Chandler, LLC is a Massachusetts limited liability company with its principal place of business at 372 Washington Street, Wellesley Hills, MA 02481.

11.      Defendant Robert Simon Fine Art, Inc. is a New York corporation with its principal place of business at Satis House, 53 Tower Hill Road East, Tuxedo Park, NY 10987.

12.      Defendant Six Hamilton, LLC is a Delaware limited liability company with its principal place of business at 842 Sleepy Hollow Road, Briarcliff Manor, NY 10510.

13.      Defendant Salvator Mundi, LLC is a Delaware limited liability company with its principal place of business at 1209 Orange Street, Wilmington, DE 19801.

14.     Defendant Rittenhouse Associates LLC is a New York limited liability company with its principal place of business at 372 Washington Street, Wellesley Hills, MA 02481.

15.     Defendant Adelson Galleries, Inc. is a New York corporation with its principal place of business at 730 Fifth Avenue, 7th Floor, New York, NY 10019.

16.     Defendant Warren Adelson is a citizen of the State of New York, residing at 842 Sleepy Hollow Road, Briarcliff Manor, NY 10510.

17.     Defendant Alexander Parish is a citizen of the State of New York, residing at 185 Strawtown Road, New City, NY 10956.

18.     Defendant Robert Simon is a citizen of the State of New York, residing at Satis House, 53 Tower Hill Road East, Tuxedo Park, NY 10987.

**JURISDICTION AND VENUE**

19.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).  Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2).

20.     The Defendants also agreed in their two contracts with Sotheby's to submit to the exclusive jurisdiction of the state or federal courts in Manhattan.

**FACTUAL ALLEGATIONS**

**Private Sales in the Art Market**

21.     In addition to its renowned auction business, Sotheby's also is in the business of, among other things, facilitating private sales of high value works of art.  The purpose of these private sales is to assist customers who wish to sell or purchase art without participating in the public auction process, which may impact the price and marketability of a piece.  In the market for fine art at a high price point (such as the *Salvator Mundi*), the fact that a seller has tried, but failed, on multiple occasions to sell a particular piece will tend to deflate the value of the work in the marketplace.

-6-

22.     It is an industry norm in the private sales market, and Sotheby's policy, to keep confidential the identities of both the buyer and the seller in a private sale transaction (including from each other), unless the parties elect otherwise.

**The Defendants Acquire the _Salvator Mundi_**

23.     On information and belief, Defendant Parish acquired the _Salvator Mundi_ for under $10,000 at an estate sale in Louisiana in the early 2000s.  At the time, it was generally believed that the work had been painted by a member of Leonardo's school, but not by Leonardo himself.  Now, due in part to the work of Defendants Parish and Simon, who acquired a share in the painting after Defendant Parish sought out his expertise in Old Master paintings, the painting is accepted as part of Leonardo's catalogue.

24.     Sometime after Defendants Parish and Simon acquired the _Salvator Mundi_, Defendant Adelson, who also owns a fine art gallery in Manhattan, contacted Sotheby's because he was contemplating investing $10 million for a one-half share in the work and wanted to know whether Sotheby's believed the painting was an authentic Leonardo.  As a favor to Defendant Adelson, a longstanding client, an expert at Sotheby's named George Wachter (the Chairman of Sotheby's North America and South America and Co-Chairman of Old Master Paintings Worldwide) confirmed that he believed the work to be a real Leonardo.  Defendant Adelson then apparently decided to invest, ultimately purchasing a one-third share in the painting for $10 million.

**Bouvier Contacts Sotheby's Regarding the _Salvator Mundi_**

25.     On or about March 11, 2013, Bouvier contacted Samuel Valette ("Valette"), Sotheby's London-based Vice Chairman of Private Sales Worldwide.  Valette confirmed that another expert at Sotheby's, Alexander Bell ("Bell"), the London-based Co-Chairman of Old

-7-

Master Paintings, believed the *Salvator Mundi* to be an authentic Leonardo and said that Bell also was personally familiar with Defendants Parish and Simon.  At the time, Bouvier or Bouvier-controlled entities owned and operated numerous freeports around the world and were the largest tenant in the Geneva Freeport, where thousands of the world's most renowned works of art are stored.

26.     In March 2013, at the time Bouvier reached out to Sotheby's about the *Salvator Mundi*, Bouvier was already a client of Sotheby's, and Valette served as his primary contact.

27.     At Bouvier's request, Bell then contacted the Defendants to let them know that he had a potential buyer for the *Salvator Mundi*.

28.     On information and belief, by the time Bouvier contacted Sotheby's about the *Salvator Mundi*, the Defendants had been trying—unsuccessfully—to sell the work for a considerable time, including to the Kimbell Art Museum in Fort Worth, Texas, for $125 million, and to a buyer in Boston, Massachusetts, for $200 million.  As noted above, the fact that a seller has tried and failed on multiple occasions to sell a particular piece of fine art at a high price point will tend to deflate the value of the work in the marketplace.

29.     When Sotheby's first contacted the Defendants, the Defendants were hoping to sell the painting for $150 million, and claimed to have been in discussions with another buyer— but the Defendants at no point revealed who this potential buyer was, aside from describing this person as Russian—about selling the work for approximately $120 to $125 million.  The Defendants have only recently claimed that this other buyer was Rybolovlev.[2]  Consistent with

---

[2] On information and belief, and although not known to Sotheby's until in or about March 2016 during communications with the Defendants' counsel, another intermediary had been in contact with the Defendants on behalf of Rybolovlev at some time prior to March 2013 with regard to the sale of the *Salvator Mundi*.  On further information and belief, and again not known to Sotheby's until in or about March 2016, Bouvier asked Rybolovlev if he could take over the

Footnote continued on next page

the Defendants' initial asking price, Sotheby's initially purchased insurance for the painting at $150 million to protect itself against potential loss or damage.

**The March 19, 2013 Agreement between Sotheby's and the Defendants**

30.     On March 19, 2013, Sotheby's and the Defendants entered into an agreement (the "March 19 Agreement") that provided that Sotheby's would transport the *Salvator Mundi* from the Defendants' custody to Sotheby's custody so that Bouvier could view the painting.  .

31.     Under the March 19 Agreement, Sotheby's' contractual obligations were limited to transporting and showing the *Salvator Mundi*, and to communicating an offer (if one were to be made) to the Defendants.  In the event of an offer, the contract further provided that Sotheby's would continue to hold the painting for an additional fourteen days to allow the Defendants, Sotheby's, and Bouvier to negotiate final sale agreements.  If no offer was made, the contract required the return of the painting to the Defendants by March 22, 2013.

32.     The March 19 Agreement additionally provided:  "We make no representation or warranty of the anticipated selling price of the Property, and no estimate anywhere by Sotheby's of the selling price or value of the Property may be relied upon as a prediction of the actual selling price for any purpose."

---

Footnote continued from previous page
negotiations for this potential sale from the other intermediary, and Rybolovlev agreed to have Bouvier act as his agent (with the two further agreeing that Bouvier would receive a 1% commission).  According to press reports, Rybolovlev was living at the time in Cologny, Switzerland.

**The March Viewings of the *Salvator Mundi***

33. On March 21, 2013, Sotheby's arranged for Bouvier's Agent to view the painting in its viewing room in New York.

34. The following day, on March 22, 2013, also at Bouvier's request, Sotheby's and the Defendants arranged for the painting to be delivered to Bouvier for a private viewing at an apartment on Central Park West. Bouvier met Valette in the lobby of the apartment building, and escorted him to an apartment where a small group of people was gathered. Bouvier and one of the men in the room took the painting into a separate room to view the work, returning to the main room after a few minutes. This third man did not introduce himself to Valette; nor did they speak to each other. Valette had seen this third man on an earlier occasion in Europe and recognized him as someone associated with a previous sale involving Bouvier.

35. It was not, however, until much later that Valette and Sotheby's learned that this third man was Rybolovlev, and not until after Bouvier was arrested in a Monaco criminal proceeding that Valette and Sotheby's learned that Rybolovlev had purchased the *Salvator Mundi* from Bouvier. At no time, including during the apartment viewing, did Valette know what Bouvier intended to do with the *Salvator Mundi* after he purchased it.

**The April 10, 2013 Negotiations between the Defendants and Bouvier**

36. On March 25, 2013, Adelson sent an e-mail to Valette to extend a two-week option to "you and your client" to purchase the *Salvator Mundi* for $100 million. Defendant Adelson well understood through the course of the negotiation that Bouvier was a Sotheby's client.

37. On or about April 1, 2013, a "closing meeting" was scheduled for April 10, 2013 in Paris, to be attended by representatives of Bouvier and the Defendants.

38.    On or about April 8, 2013, Valette sent an e-mail to Adelson about the plans for the meeting in Paris.  The e-mail contained an itinerary for the April 10 visit and stated, based on Bouvier's communications to Valette, that Bouvier's intention was to loan the painting to a privately-owned museum called La Pinacothèque if the negotiations proved successful.  At no time did Bouvier or Bouvier's Agent (or anyone else representing Bouvier) disclose to Valette (or to anyone at Sotheby's) that Bouvier had the intent to immediately re-sell the painting, much less that Bouvier intended to do so for tens of millions of dollars more than its purchase price from the Defendants.  It was also Valette's understanding that Bouvier had an ownership interest in La Pinacothèque, and that Bouvier was in fact contemplating having the *Salvator Mundi* displayed at La Pinacothèque.

39.    On April 10, Defendant Adelson met in Paris with Valette and Bouvier's Agent. The Defendants were aware that Bouvier's Agent represented a buyer who wanted to remain confidential.  While in Paris, Defendant Adelson took a tour of La Pinacothèque.

40.    Negotiations continued that evening over dinner, with Bouvier's Agent continuing to act on behalf of Bouvier in the discussions and Adelson negotiating for the Defendants. Valette and Bell attended on behalf of Sotheby's.  At one point, when both parties appeared to have reached an impasse, Defendant Adelson asked whether the potential buyer owned some other work of art that he would be willing to "trade in" as part of the purchase price for the *Salvator Mundi*.  After speaking over the telephone with an individual Sotheby's believes was Bouvier, Bouvier's Agent offered to give the Defendants $68 million and Pablo Picasso's *Le Fumeur*, which Bouvier's Agent represented to be worth $12 million, and which the Defendants intended to then re-sell through Sotheby's.  Ultimately, after Bell spoke with Defendant Simon and Defendant Parish by telephone—a call during which Bell acknowledged that the price was

not as high as the Defendants had been hoping for, but that it was a good price that would allow the Defendants to immediately enjoy the cash from the painting's sale—the Defendants accepted the offer.

41.     What neither the Defendants nor Sotheby's knew at the time was that, while Bouvier's Agent was locked in negotiations with the Defendants, zeroing in on a selling price of around $80 million, Bouvier separately was describing a very different scenario to Rybolovlev. As entities affiliated with Rybolovlev (the Petitioners) have alleged in papers they filed in a 28 U.S.C. § 1782 petition in the Southern District of New York:

> In e-mails sent by Bouvier to Petitioners' representative, Bouvier described fabricated hard-nosed negotiations with the seller of the painting.  For example, Bouvier falsely represented that Petitioners' $100 million offer was "rejected without a moment's hesitation," and that the seller is "[o]ne tough nut, but I'll fight and take as long as necessary."  Bouvier also falsely claimed that the deal was "[c]linched at 127.5.  Terribly difficult, but it's a very good deal with regard to this unique masterpiece by Leonardo."

*In re Application of Accent Delight Int'l Ltd.*, No. 1:16-mc-00125-P1, at 4-5 (S.D.N.Y. filed March 25, 2016).

**<u>The May 1, 2013 Agreement between the Defendants and Sotheby's</u>**

42.     Although Sotheby's had been approached about the *Salvator Mundi* by Bouvier, and the Defendants negotiated directly with Bouvier's Agent, Sotheby's facilitated the closing of the sale of the painting on behalf of the Defendants.  This is a typical industry practice in connection with private art sales.

43.     On May 1, 2013, Sotheby's and the Defendants entered into the Private Treaty Sale Agreement (the "May 1 Agreement").  Under the agreement, the Defendants granted Sotheby's the exclusive right to facilitate the *Salvator Mundi* sale between the Defendants and Bouvier.  To this end, the Agreement expressly stated that in the event the sale with Bouvier was

not consummated due to conditions precedent not having been met, Sotheby's would have no further obligation to sell the *Salvator Mundi* and would promptly return the painting to the Defendants.

44.     The May 1 Agreement incorporated the purchase price that had already been agreed upon between the Defendants and Bouvier in their direct face-to-face and arms-length negotiations:  "The minimum purchase price for the Property shall be an amount which will result in a payment due to you of not less than Eighty Million Dollars ($80,000,000)."

45.     The May 1 Agreement also provided:  "You and we agree that the Property will be offered for sale '**AS IS**' and neither you nor we shall make any representations or warranties with respect to merchantability, fitness for a particular purpose, the physical condition, size, quality, rarity, importance, provenance, restoration, exhibitions, literature, historical relevance, or value of the Property and no statement anywhere, whether oral or written, shall be deemed such a representation or warranty."  The only exception was as follows:  "Notwithstanding the foregoing, for a period of (4) years from the Closing Date, we will guarantee to the Purchaser that . . . it is the opinion of generally accepted scholars and experts at the Closing Date that the Property is by Leonardo da Vinci."

46.     Further, the Defendants expressly "acknowledge[d] that [they were] aware of the relative advantages of consigning property for sale by public auction and via private sale, and having taken those considerations into account, wish to sell the Property via private sale with Sotheby's as [their] exclusive sales agent pursuant to the terms of this Agreement."  Finally, had the Defendants wished to impose conditions on the purchase or to sell only to a certain type of buyer (for example, to ensure that the painting would be displayed in a public art collection for

some period of time), they could have negotiated to include such terms as part of the sale. They did not do so.

47.     At no time did Bouvier or Bouvier's Agent (or anyone else representing Bouvier) disclose to Sotheby's that Bouvier intended to re-sell the *Salvator Mundi* immediately after purchasing it. As noted, Sotheby's did not learn of the re-sale of the painting to Rybolovlev until the press reported it in connection with Bouvier's arrest in Monaco. Sotheby's learned the purported price of the re-sale sometime shortly thereafter, again from press reports and court documents; to this day Sotheby's has no independent knowledge of the re-sale price. Sotheby's was not involved with Bouvier's re-sale of the *Salvator Mundi* to Rybolovlev and it derived no financial benefit whatsoever from the sale. Further, Sotheby's only learned through the same press reports and court documents about the amounts for which Bouvier was purportedly re-selling other art pieces that Bouvier had purchased.

**Events Following the May 2013 Sale of the *Salvator Mundi***

48.     As revealed by media reports and court filings, shortly after the sale of the *Salvator Mundi* by the Defendants to Bouvier, Bouvier sold the painting to Rybolovlev for $127.5 million.

49.     Bouvier not only never disclosed to Sotheby's his resale to Rybolovlev at a huge markup from what he paid the Defendants, but he also misled Sotheby's into believing that he in fact remained the owner of the *Salvator Mundi* long after he acquired the piece in May 2013. In particular, on January 21, 2015, Bouvier contacted Valette to request that Sotheby's conduct an insurance valuation of the *Salvator Mundi*.

50.     Owners often ask Sotheby's to provide insurance appraisals months and years after acquiring a work. As is well known in the art market, insurance valuations are not made for

purposes of providing a statement of a work's fair market value.  Rather, they are designed to approximate the cost of acquiring a replacement of like kind and quality in the event that the item is destroyed.  Because the appraising experts assume that the work of art being appraised will no longer be available in the art market, and that the relevant collection of the artist's works will be reduced by one (a particularly significant drop in the market for works of art as rare as Leonardo paintings), it is typical for a work's insurance value to be significantly higher than its likely fair market value.

51.     On January 28, 2015, Sotheby's provided Bouvier with an insurance valuation for the *Salvator Mundi* at €100 million, or approximately $113.4 million at the time.[3]  Sotheby's valuation made clear that the insurance value listed was "based on our reasonable opinion of the actual retail purchase price or probable cost of having to replace the item with a comparable item in similar condition at today's date."

52.     On information and belief, based on allegations in the Monaco proceedings, Bouvier gave a copy of Sotheby's insurance appraisal to Rybolovlev.  Rybolovlev has asserted that Bouvier used this insurance valuation, which was closer to the price Rybolovlev paid for the work, to justify the price and perpetuate his fraud.  Whatever Bouvier may have communicated to Rybolovlev about the painting, Sotheby's had no knowledge whatsoever of any such communication, and stands by its insurance valuation of the *Salvator Mundi*.

53.     As noted above, Rybolovlev since has filed civil suits and leveled criminal charges against Bouvier and associated individuals and entities in a number of jurisdictions throughout the world, including in Monaco, France, and Singapore.  Rybolovlev has alleged in

---

[3] *See Historic Exchange Rates (Euro)*, X-RATES, http://www.x-rates.com/historical/?from= EUR&amount=100000000&date=2015-01-28.

these various cases that Bouvier cheated him out of over $1 billion in connection with the sales of approximately 38 important pieces of art, including, among others, the *Salvator Mundi*. As also noted above, on February 8, 2016, *The New Yorker* published a lengthy article about the foregoing dispute between Rybolovlev and Bouvier.

54.     Almost immediately after this article was published, the Defendants contacted Sotheby's and asserted that Sotheby's owes them damages arising out of the sale of the *Salvator Mundi*. While the Defendants' legal theories have been difficult to discern, they have asserted that Sotheby's should pay them at a minimum the difference in price between the $80 million they were paid and the $127.5 million that Rybolovlev paid Bouvier. They also have asserted that they intend to bring a civil action asserting, among other causes of action, claims alleging breach of fiduciary duty, fraud, and a violation of the civil RICO statute, 18 U.S.C. § 1964(c).

**The Impending Threat of Suit by the Defendants**

55.     On or about March 24, 2016, counsel for the Defendants sent a proposed tolling agreement to Sotheby's. That draft tolling agreement referenced certain threatened claims by the Defendants against Sotheby's, "including but not limited to civil RICO claims."

56.     On or about April 11, 2016, Sotheby's and the corporate Defendants executed a tolling agreement that, among other things, acknowledged the existence of "disputes and controversies" between Sotheby's and the Defendants.

57.     On July 12, 2016, counsel for the Defendants sent Sotheby's a notice of the Defendants' "inten[t] to commence litigation against" Sotheby's after 30 days.

58.     To date, the Defendants have not commenced litigation against Sotheby's, but the parties have been unable to resolve their dispute through other methods of resolution.

59.     Sotheby's continues to remain under threat of litigation by the Defendants, which could be commenced at any time.

### CLAIM
### (For Declaratory Judgment Under 28 U.S.C. § 2201)

60.     Sotheby's repeats and realleges the allegations made in paragraphs 1 through 59 above as if fully set forth herein.

61.     Sotheby's has complied fully with all of its obligations arising under the March 19 and May 1 Agreements, and it had and has no further obligations to the Defendants in connection with the sale of the *Salvator Mundi*.

62.     The Defendants have suffered no loss in connection with the March 19 or May 1 Agreements, and no loss in connection with the sale of the *Salvator Mundi*.  If they did suffer any loss in connection with the sale of the *Salvator Mundi*, Sotheby's did not cause that loss and is not otherwise liable to the Defendants for such loss under 18 U.S.C. § 1964(c) or any other legal theory.

63.     Sotheby's seeks entry of judgment declaring that it has complied with its contractual obligations in connection with the *Salvator Mundi* sale and had no further obligations to the Defendants in connection with the sale of the *Salvator Mundi*; that the Defendants have suffered no loss under the contractual agreements or in connection with the *Salvator Mundi* sale; and that to the extent the Defendants have suffered any loss in connection with the sale of the *Salvator Mundi*, Sotheby's did not cause that loss and is not otherwise liable to the Defendants for such loss.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.  Enter a judgment declaring that (1) Plaintiff has complied with all of its obligations arising under the March 19 and May 1 Agreements and did not have any other obligations to the Defendants in connection with the *Salvator Mundi* sale; (2) the Defendants suffered no loss in connection with the March 19 or May 1 Agreements or the *Salvator Mundi* sale; and (3) to the extent the Defendants have suffered any loss in connection with the *Salvator Mundi* sale, Plaintiff did not cause that loss and is not otherwise liable to the Defendants for such loss under 18 U.S.C. § 1964(c) or any other legal theory.

B.  Grant Plaintiff the costs and fees associated with this action, including reasonable attorney's fees, together with such other relief as the Court may deem just and proper.

Dated: New York, New York
       November 21, 2016

      Respectfully submitted,

      ARNOLD & PORTER LLP

      By: */s/ Marcus A. Asner*
        Marcus A. Asner
        Sara L. Shudofsky
        399 Park Avenue
        New York, New York 10022
        Telephone:  (212) 715-1000
        Facsimile:  (212) 715-1399
        marcus.asner@aporter.com
        sara.shudofsky@aporter.com

        *Counsel for Plaintiff Sotheby's, Inc.*